**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KATHERINE KLINE, | : |
| | : |
| Plaintiff | : |
| | : |
| v. | : |
| | : |
| CENTRAL NATIONAL- GOTTESMAN, | : |
| INC. and LINDENMEYR CENTRAL | :        JANUARY 1, 2019 |
| | :        JURY TRIAL DEMANDED |
| Defendant | : |
| | : |

**COMPLAINT**

**KATHERINE KLINE**, as and for her claims against the Defendant alleges as follows:

**I.      PRELIMINARY STATEMENT**

1.      This is Katherine Kline's ("Ms. Kline") Complaint against her former employers Central

National Gottesman, Inc. and division / subsidiary Lindenmeyr Central (referred to collectively

herein as "CNG") and for unlawfully discriminating against her in violation of Title VII of the

1964 Civil Rights Act, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 and

12102, the Family and Medical Leave Act (FMLA) and the Connecticut Family Medical Leave

Act (CTFMLA), and for hostile work environment and intentional infliction of emotional

distress.

**II.     PROCEDURAL PREREQUISITES**

2.      On November 6, 2017, Plaintiff filed a "dual charge" of discrimination against

Defendants with the Connecticut Commission on Human Rights and Opportunities (CHRO) and

the United States Equal Employment Opportunity Commission (EEOC).

3.      On October 8, 2018, Plaintiff received a Notice of Right to Sue letter from the EEOC

regarding charge number 52302018-00093. (See **Exhibit A**).

## III.   **JURISDICTION AND VENUE**

4.      This court, in accordance with § 1331, has jurisdiction over Plaintiff's claims because

this civil action arises under laws of the United States.

5.      This action is authorized and instituted pursuant to the 42 U.S.C. § 12101 and 12102.

This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. This Court has venue

over this action pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or

omissions giving rise to the claim occurred in this judicial district.

## IV.   **PARTIES**

6.      Plaintiff, Katherine Kline, is a resident of the State of Connecticut, resides in Fairfield,

Connecticut and worked out of Defendant's office in Southport, CT.

7.      Defendant, CNG is a worldwide distributor of paper and paper products.  At all times

relevant to this Complaint, Plaintiff was a resident of Connecticut and was employed by CNG in

Connecticut.  Lindenmeyr Central is a division/subsidiary of CNG.  CNG and Lindenmeyr

Central maintain a common ownership, common management, common human resource

department, common payroll department, common email system, such that Defendants are

considered one single joint employer and one corporate enterprise.

## V.   **STATEMENT OF FACTS**

8.      Plaintiff started her employment with A.T. Clayton on March 26, 2007.  She was initially

hired to be an executive assistant to the former CEO.  In 2013, A.T. Clayton was acquired by

Central National-Gottesman.

9.      In July 2013, after six plus years as executive assistant to the former CEO and chairman,

Plaintiff proposed a new research and business development role to Peter Harding, the incoming CEO. This created a new opportunity for Plaintiff within the company and established an innovative job function at A.T. Clayton.

10.     Plaintiff's time serving the former CEO was widely known as a successful, friendly and mutually respectful relationship. Her performance reviews were consistent in exceeding expectations. She earned kudos from fellow employees by implementing ideas to boost company morale.

11.     Specifically, Plaintiff's work accomplishments translated into substantial revenue for the company. Her efforts were launched without a boss or playbook, and without a software program, support network, or process in place. She set out to help the sales force prospect more effectively by leveraging research, LinkedIn, google alerts, and specific industry subscriptions to tee up opportunities.

12.     Plaintiff's original idea and process, which quickly evolved and expanded into creating other jobs. In fact, jobs for both Mike Stern and Jim Carini were created under her program. Both men were given senior VP titles when hired, they were both given higher salaries than Plaintiff, they were both provided with budgets for expense reports, and they were both routinely included in meetings and events inside and outside the company for professional grooming and acceptance purposes. However, on information and belief, neither Mike Stern or Jim Carini has ever presented a lead or idea that generated new business.

13.     Plaintiff's approach made a difference. Even in just managing the prospect list, such as reassigning accounts under the right rep – for example moving Serena & Lily from Bill Driscoll to Don Bergen. Serena & Lily is now an active business with A.T. Clayton. Over the last few years she has alerted sales reps on dozens and dozens of occasions with connections and

meaningful information resulting in another seven opportunities where we successfully converted prospects to active business.  Yet somehow this was always twisted into under valuing her efforts.  It was Plaintiff's job to identify the opportunity and provide intel and collaborate on strategy, which she excelled at.  She did it much better than the men to whom she reported.  She took initiative.  When she learned there was a risk Defendant might lose longtime client L.L. Bean, Plaintiff dug into research without being asked and made a respectable pitch on what they could do to potentially save that legacy account of 25 years.  Peter Harding praised her work and forwarded her proposal to senior management, including President and CEO Andrew Wallach.

14.    Clearly, Peter Harding felt Plaintiff's contributions were worthy enough to be passed onto Andrew Wallach, the President and CEO of Defendant's parent company, Central National Gottesman Inc.  Her idea pitch contained good information and great original thought, but in the end, it was too late.  She was frustrated that she was not more in the loop. It was also unfortunate that there was no one mentoring Plaintiff.

15.    By January 2014, after 6 months in her research role, Plaintiff was working with the sales team, but it was soon clear that her job was going to be an uphill battle.  She arrived one morning in January 2014 to rows of empty offices. Every door was closed and every light was off, including the executive offices of the CEO (Peter Harding) and COO (Eric Sullivan).  Nervous that she might have missed an email, she checked the large conference room where town hall meetings were held.  It was empty.  She headed over to the other side of the building where customer service was located (which was staffed primarily with women).  Multiple women then confirmed that the "guys" that Plaintiff worked with, which was the entire sales team and senior management, were away at a 3-day annual EOY (end of year) meeting being held at the Ritz Carlton in Westchester.  Plaintiff was saddened and humiliated when she realized she was the

only person in her group who was not invited (She was also the only female employee in the business development and sales group).  Peter Harding apologized to her after the group (all men) returned to the office.

16.     At that time, Plaintiff had been reporting to two men in sales.  A few months into 2014, she began reporting to Eric Sullivan, A. T. Clayton's COO.  This arrangement would be short-lived.  In late July 2014, Jim Carini was hired as Plaintiff's new supervisor.  Jim had just completed a modest consulting project for the company and somehow parlayed this into a full-time job.  He was from outside the company and had no experience in this industry.  He also lived in Chicago.  When Jim was hired, he was given a double title, VP of Marketing and VP of Business Development.  Jim then wrote up Plaintiff's job description, giving her the title of Business Development Manager, and set up a compensation plan linking their performance together for 2015.  The plan Jim set up specifically detailed that Plaintiff required prior approval for any expenses.  Jim, however, did not have any such requirement.  At that early stage it was already clear to Plaintiff that he was discriminating against her because she is a woman.

17.     Jim commuted bi-weekly from Chicago to the Stamford office.  It was very unproductive for Plaintiff to have a remote boss who was neither naturally proactive or engaged.  Plaintiff was forced to constantly bring Jim up to speed on business activity.  In Q3 of 2015 the disconnect was widespread.  Most email communications and requests from the salesforce reflected Plaintiff was managing new opportunities on her own.  On multiple occasions, Plaintiff requested to attend industry events, but was told there was "no budget" for her to do so.  However, the men in her group and in the sales group, including Jim Carini, would typically attend multiple events per year, which allowed them to promote the company and network.  When it came to Plaintiff, she was expected to secure sales meetings and bring in new business without ever leaving the office.

The gender discrimination was glaring.  It was appalling that she was being told there was no budget for her to go to important industry events while at the same time the company was willing to pay for her supervisor to regularly commute to Stamford from Chicago, including car service, airfare, hotel, cell phone reimbursement, and per diem for dining.  Plaintiff was hamstrung with an ineffective boss and devoid of any funding for her success.

18.     At the end of 2015, Plaintiff proactively prepared a report card to be reviewed with Peter Harding.  The graph highlighted the meetings and new business for the year that was exclusively as a result of her work and her success at sourcing new opportunities.  This exercise clearly identified her independent efforts throughout the year.  However, when bonuses were distributed, Plaintiff discovered that Jim Carini and she were considered "partners" on the compensation plan and the $30,000 bonus was split 50/50 between the two of them.

19.     Plaintiff found it completely unethical for Jim Carini to collect a $15,000 bonus – 50% – where he had contributed absolutely nothing to the initiative to develop new business.  Plaintiff was 100% responsible for the success.  Plaintiff also believed the reverse situation – that a female in this company would never be awarded a substantial bonus in connection with a project she didn't have a meaningful (or any) contribution to.

20.     After the report card review where she found out about the bonus, she approached Peter Harding requesting to not repeat this compensation structure in 2016.  Plaintiff explained that she had done virtually all of the work that the bonus was being awarded for.  Peter then verbally agreed to separate her from a shared plan with Jim in the future.

21.     Just two months after bonuses were distributed, Peter told Plaintiff in confidence that he was going to fire Jim Carini. Plaintiff questioned why Jim was paid half of the bonus for her work only 60 days before if the company felt his overall performance was poor enough to

terminate him.

22.     Peter held off talking to Jim until late August 2016.  When the matter was finally addressed, Plaintiff was told by Peter that Jim was shocked and very upset.  For reasons Plaintiff did not and still does not understand, the termination was called off and Jim was given a second chance.  To Plaintiff, this was clear favoritism of male employees – Jim was not performing in his role in Plaintiff's Business Development Group, but he was given a second chance.  It was decided that Jim would stay on and Jim and Plaintiff would both now report to Mike Stern.  Mike Stern, on information and belief, was a close friend of Peter Harding's and he was also, like Jim Carini, hired from outside the company and outside the industry.  When Mike was hired, he was also crowned with a dual title: GM, Brandmatch and VP Business Development.  Mike started in October 2016.  Going forward, Plaintiff was expected to work alongside Jim, who was no longer her boss, and no longer losing his job.  Jim continued commuting to the Stamford office from Chicago and stayed in a hotel suite while he was in Connecticut, all at the continued and ongoing expense of the company.

23.     A significant investment of resources and budget was provided to Defendant's new Vice President, Mike Stern, ensuring Mike's success and acceptance within and across the company.  For example, Mike was quickly sent to paper school on the West Coast for a week, which is a weeklong seminar used to give employees a comprehensive understanding of the paper industry.  This educational opportunity was also offered to all incoming sales staff, all of whom were male.  This was particularly notable to Plaintiff as discriminating against her as a woman because, on more than one occasion, Peter Harding commented to Plaintiff that there were aspects of the business, like paper, that she didn't know well.  In contrast to what was offered to Mike, Jim, and the other male employees, Plaintiff never received any onsite or offsite training.  The company

training track was <u>exclusively</u> geared toward male employees.  It was extremely frustrating that Peter appeared to hold it against Plaintiff that she was not offered or provided industry education that was offered to male employees. Plaintiff felt her skills and contributions were constantly dismissed, belittled, and undervalued because she is female.

24.     Further opportunities to engage, learn, be accepted, and advance were offered to both Jim Carini, Mike Stern, and other male salesmen.  Peter Harding invited male employees to attend college and professional sporting events, dinners with vendors (such as paper mills) and various outings with clients.  Additionally, monthly expense budgets were in place for Mike and Jim.  None of these frills were extended to Plaintiff.  Plaintiff frequently requested to be more involved and Peter Harding would tell her that he agreed and wanted to increase her role, but that it would happen in the future or later when he was less busy.

25.     The <u>only</u> invitation Plaintiff received for an industry event came directly from a woman who worked at one of the company's vendors.  She told Plaintiff that she felt Plaintiff should be included at a holiday dinner they were hosting.  Peter Harding and Mike Stern refused to invite Plaintiff to such events.  Mike Stern received major attention from Peter Harding and other executives.  He and Peter Harding went to Las Vegas for a long weekend to celebrate Mike's first 100 days, and, approximately 7 months after Mark was hired, Peter and Mike went to Germany for business.  Mike also attended a gathering in California hosted by Don Bergen, SVP.  The budget and opportunities seemed endless for Mike.  At that point, Plaintiff had been in an employee for almost nine years, and in her role in business development for three years, and the company didn't even offer her a cell phone.

26.     During Mike Stern's second week (around approximately October 2016) he asked to sit down with Jim Carini and Plaintiff to discuss Plaintiff's performance.  During that meeting, he

made several statements that Plaintiff found to be extremely intimidating and hostile.  It was

immediately clear to Plaintiff that he was trying to foster a competitive and authoritative aura.

He made comments such as:

- "As an athlete…" (insinuating his competitive nature).
- "I need to trust you; it is extremely important. Do you understand? I need to trust you ... I want to be able to trust you with the lives of my children"
- He repeatedly emphasized that he was superior, constantly using phrases such as "as your manager" to open statements.
- "Do you have personal stationary? If not get it, I'm not asking you ... it is important to follow up with a handwritten note.  If you do not own some buy it and expense it to the company."
- "We are a team, I'm a good guy but if you back me into a corner I WILL KILL YOU"

27.     Plaintiff was horrified at Mike's aggressive behavior.  At that point, she had been at the

company for nine years and she felt truly threatened at work.  Again, Mike had only been there

for approximately two weeks at this time.  Plaintiff didn't feel there was any context or need for

his aggressive and hostile comments and behavior.

28.     After that meeting, Plaintiff informed Jane Harness, Human Resources representative,

that she was uncomfortable with Mike's aggressive comments and behavior.  Jane asked Plaintiff

if anyone else was there in the room during those comments, to which Plaintiff confirmed that

Jim Carini was present.  This question struck Plaintiff as concerning because it seemed as if Jane

Harness was trying to determine if the incident could be ignored.

29.     After Plaintiff reported Mike's behavior to Human Resources, she was immediately and

continuously retaliated against.  Mike's behavior toward her became worse; he was insulting,

condescending and overbearing toward Plaintiff.  Plaintiff tried to be accommodating, but

Mike's behavior was extremely stressful and upsetting.  At one point during a business

development meeting, Mike asked Plaintiff, in his typical hostile and threatening manner, "what is your problem."  Plaintiff replied, as calmly as she could, "you are micro managing."  Mike was furious and ordered her to leave the meeting.  Plaintiff complied but it was stressful, degrading, and humiliating.

30.    On October 18th, Plaintiff received a text message from Mike: "You mentioned having a 4pm meeting. Is that in the Southport office? Approx. how long do you expect the meeting to run?"  Plaintiff responded, "My 4:00 today is a doctor appointment I scheduled it at the end of the day. I won't be coming back to the office.  He texted Plaintiff back: "Ok.  Then put this important conversation on your schedule for 8:15am tomorrow morning.  See you then."

31.    Plaintiff was fearful to be alone with Mike for this meeting, in an empty office building at 8:15 am.  When she arrived for this meeting, Mike's opening remark to her was "You have really negative energy."  Plaintiff quickly said she was uncomfortable and told him that she did not appreciate being called in before business hours when no one else would be present and she told him she felt he was behaving like a bully.

32.    This horrible experience combined with the strange conversation about his values on trust and killing those who corner him needed to be addressed/managed by someone other than Plaintiff.  As a result, again, Plaintiff went to Jane Harness in Human Resources to ask for help.  She also memorialized her concerns in emails to both Jane Harness and Peter Harding.

33.    After reporting her concerns about Mike to Jane Harness and Peter Harding, it was immediately clear to her that she was going to be punished for complaining about Mike's behavior.  She felt this was largely because Peter Harding and Mike Stern were friends and that the male friendship was being valued over business responsibility.  She was told by other employees that Peter was angry and was heard saying "I don't need her drama and distraction, I

have a business to run."

34.     Peter later told Plaintiff that he shared what was happening between Mike Stern and

Plaintiff with people outside the company and some of their mutual friends.  Plaintiff was

perplexed why he would share workplace issues with other people.  He told Plaintiff he hoped it

would "get back to me" and they would "talk some sense into me."  Plaintiff understood this to

mean that he wanted her to drop her complaints about Mike Stern.  Additionally, Peter exposed

the situation between Mike and Plaintiff with other senior management at the company,

describing the situation as being Plaintiff's fault.  This was extremely hurtful and misogynistic,

not to mention frustrating that Plaintiff's male boss was protecting his male colleagues and

describing her concerns as "drama."

35.     Around this time, Plaintiff's male colleagues were essentially not speaking to her.  Mike

was regularly holding meetings with Jim Carini and pointedly excluded – meetings that Plaintiff

previously would <u>always</u> have been included in.  Mike Stern also began to give Plaintiff

excessive administrative work to do, such as scheduling meetings with sales team members, that

she had not previously been responsible for.  She felt he was deliberately trying to reduce her

role and to effectively demote her.

36.     At that point, Plaintiff went back to Jane Harness in Human Resources and asked if she

had documented her complaint regarding Mike Stern.  Jane seemed surprised by that question

and asked Plaintiff why she was asking.  Plaintiff was startled and confused as her understanding

had been that Human Resources would document any complaints regarding any employees, but

it appeared that Mike Stern was being protected.

37.     A few days later, Mike Stern sent Plaintiff an email with a write up of her job description

and responsibilities.  In this job description, Mike Stern changed her title from "Business

11

Development Manager" to "Research Associate."  Plaintiff had not been expecting a revised job description at this time and her job responsibilities and her role did not change.  It was clear to Plaintiff that Mike had created the revised job description simply to degrade her job title in an effort to punish her.

38.     Around this time, Jane Harness in Human Resources organized a meeting with Plaintiff herself, and Mike Stern, supposedly to "mediate" the situation.  Plaintiff was offended with the tenor and purpose of this meeting. Jane Harness essentially ignored her complaints regarding Mike's inappropriate behavior and instead focused the meeting on the supposed "new role" Mike was creating for her.  It was clear Mike was getting a pass for his hostile and intimidating conduct and the message to Plaintiff was that she could either deal with it or quit her job.  Peter Harding was also giving her the silent treatment. Plaintiff hoped this storm would blow over but was not expecting that to be the case.  Still, Plaintiff persevered as she had pioneered her job and wasn't about to give up.

39.     Plaintiff sent an email to Peter Harding requesting to sit down with him.  During this meeting she was extremely candid with Peter and again relayed the difficulty she was having with Mike Stern's hostile and demeaning behavior toward her.  It appeared to Plaintiff that Peter was upset with her for complaining about Mike to Human Resources and, in that meeting, Peter told her very specifically "you need to fix this Katherine."   Peter then told Plaintiff that he wanted her to take Mike Stern – the aggressor toward her – out to lunch!  Plaintiff was stunned. The message to Plaintiff was that the discrimination and hostile behavior with which she was dealing was somehow her fault and that she needed to make the effort to correct it.

40.     In late November/early December 2016, Peter Harding was in charge of managing Plaintiff's performance review.  The meeting, however, was entirely unlike her previous

performance reviews.  Where typically a performance review would follow the company's

review process and policy that had been handed out in August, Plaintiff's meeting with Peter

went completely differently.  Peter told Plaintiff to come prepared to discuss any concerns.

41.     It had been several years since Plaintiff underlined founded the Business Development Group, now

being run by Mike Stern (and previously by Jim Carini).  Both Mike Stern and Jim Carini were

provided with ample budgets that empowered them to travel and attend industry events and focus

on developing business and their careers.  During Plaintiff's meeting with Peter Harding,

Plaintiff asked for a raise and he responded, "YOU MAKE A LOT OF MONEY KATHERINE."

His tone was dismissive and condescending.  At that time, Plaintiff's salary was far lower than

the men in her department.  To Plaintiff's shock, Peter then told Plaintiff that she didn't

understand "the economics" of the business.  This "review" was intended to demean Plaintiff and

make her feel overpaid, when she was underpaid compared to similarly situated males.

42.     Peter also shared with her during the "review" that Mike Stern had told him that he didn't

think she should receive a bonus.  Peter told Plaintiff that Mike stated, "We shouldn't reward her

bad behavior."  At that point, Mike had only been with the company for 3 months, but clearly he

felt secure enough to make this kind of baseless accusation.  Plaintiff was stunned as the only

"bad behavior" Mike was referring to was that Plaintiff had reported regarding his behavior to

Human Resources.  After this meeting, Plaintiff found out that that she was only getting a

$15,000 bonus, not a $30,000 bonus, and that the other $15,000 that had been in the budget to

reward to the Business Development Group was apparently not available to Plaintiff (even

though Plaintiff had been just as successful if not more successful than the previous year,

including successfully landing new client ARHAUS).  Clearly, Plaintiff was being discriminated

against because she is a woman.

43.     Plaintiff's Business Development Group spent most of December preparing for their National Sales Meeting, scheduled for January 12th & 13th at a resort in Vermont.  In preparation for this meeting, Plaintiff requested a laptop on December 13, 2016 via email to Eric Sullivan because, after January 1, Plaintiff understood that their team was expected to work several days a week in the Purchase, NY offices, and other days in the Southport, Connecticut office.  At that time, Plaintiff did not have a company laptop, only a desktop, which was already several years old and which, of course, could not be regularly moved between offices.  Both Jim and Mike and the rest of the sales team already had laptops.  Plaintiff specifically requested the exact same computer that Jim had.  However, Eric Sullivan ignored multiple email requests from Plaintiff and Mike Stern questioned Plaintiff excessively about why she wanted a new computer. This was unfair as Plaintiff was clearly only asking for the same thing her male coworkers were provided.  What should have been a simple request turned into a demeaning and belittling inquiry by Mike.  In one of his emails to Plaintiff, for example, he wrote:

> This request for and updated laptop seems to be dragging on longer than any of us expected/wanted… Please provide with a brief, clear email summary with exactly what you're asking for and why…

44.     There was absolutely no reason why Mike would respond like this regarding a very straightforward request.  At this point, the pattern of his behavior was to constantly be intimidating, discriminatory and condescending towards Plaintiff.

45.     The meeting in Vermont included the company's entire sales force, plus Defendant's consulting division, business development team and members from the leadership team, including senior executives, Peter Harding, the President, and Peter's boss Andrew Wallach, the President and CEO of Central National-Gottesman.

46.     Mike Stern was one of the presenters.  Mike opened by thanking everyone for the warm

welcome he had received since he arrived a few months ago.  Then he continued, "everyone's been great ... well everyone that is …except for Katherine Kline there for a while.".  Plaintiff was mortified.  Mike had the floor and attention of 75+ of our co-workers and leaders and he decided to shame Plaintiff in front of everyone. This was deliberate.  It was clear to Plaintiff that Mike had the support of the all-male superiors and he was untouchable when it came to insulting and demeaning her.  He continued to cross the line again and again, yet his bad, unlawful and improper behavior seemed to be without consequence.

47.     During that presentation, Mike also revealed a slide that listed Plaintiff and others by name and title as follows:

> Mike Stern, GM BrandMatch, VP Business Development
> Jim Carini, Director of Marketing
> Katherine Kline, Director of Research

48.     A few weeks later, 2017 business cards were printed.  Mike and Jim's included the same title as they had at the company meeting in Vermont.  However, Plaintiff's business card stated "Katherine Kline, Research Analyst."  This was yet again another attempt by Mike to discriminate against and mistreat Plaintiff.  At this point, "Research Analyst" also would have been the fourth job description in Plaintiff's (unchanged) role.

49.     The bizarre, offensive and aggressive behavior continued after the sales meeting.  On January 23, 2017, Mike sent Plaintiff yet another email expressing his extreme frustration on the "look" of her Purchase office workspace.  What is outrageous and absurd about this is Plaintiff still had no phone or computer at the Purchase office, despite repeatedly requesting both.  Mike was angry with Plaintiff because it didn't look like she worked in Purchase, but Plaintiff had not been provided with the very basics to do her job there. Plaintiff eventually had to go to the IT department and ask for a loaner laptop, which took more time to set up.

50.     It was routine for Mike to ignore Plaintiff's emails. This was typically when Plaintiff was asking for something that required his approval or confirmation.  For example, when Plaintiff requested time off or notified him that she was sick, he would frequently not reply.  When she was out on bereavement leave after her mother died, he emailed Plaintiff to ask when she would be returning, but then did not reply when she responded.

51.     In addition to what Plaintiff was experiencing with at work, she was also dealing with her dying mother.  By June 2017, the end was nearing and Plaintiff made hospice arrangements for her to stay at home. Plaintiff wanted and needed to be there for her dying mother and Mike Stern to talk about her taking FLMA leave.  During that meeting Plaintiff told Mike that she could not manage being her mother's primary care giver and commuting to Purchase for work.  Plaintiff asked Mike if she could suspend going to Purchase during this short time, and work out of the Southport, CT office.  Being in Southport meant Plaintiff could see her mother on her lunch break and get home to her at the end of the day in under 5 minutes, as opposed to a 60-90 minute commute to Purchase, NY.  Plaintiff was 100% able to perform all of her job duties from the Southport office and it was well within Mike's authority to grant this request. But he refused.

52.     Around the same time, Plaintiff was experiencing her own health issues.  On Wednesday July 25th, Plaintiff drove to the Purchase office.  Within 30 minutes of arriving Plaintiff was not feeling well and left immediately. She arrived home and was taken by ambulance to Bridgeport Hospital.  While she was in the hospital, her brother called Peter Harding and informed him about her condition and told him that she would need to take a few days off.  Plaintiff was diagnosed with Carpopedal Spasms, Severe Hyperventilation Syndrome and Grave's Disease.

53.     As a result of her mother's imminent death, as well as her own health issues, Plaintiff told Mike that she did in fact want to take the FMLA.  She offered to contact Brian Kalamar in

Human Resources to get the process started, but Mike quickly and oddly interjected and told Plaintiff that he would handle the arrangements.  Plaintiff was following protocol in contacting HR and also offered to contact Brian Kalamar because she had already spoken to Brian about the FMLA leave process weeks before (but had been delaying commencing leave because it would mean suspension of her pay).

54.     A couple of days went by after this conversation, but Plaintiff did not hear anything back from Mike regarding her FMLA request.  She then got a text message from Peter Harding asking her to come see him.  Plaintiff assumed it was out of concern for her taking the leave to care for her dying mother.  Plaintiff went to Peter's office within 5 minutes of receiving the text.  He started out by acknowledging her request for a leave but would not agree to the leave. He seemed to have an issue with it and immediately pressed her, asking how long Plaintiff would need to be out.

55.     Peter then told Plaintiff that he had already told Human Resources and the legal department that he would "manage" her FMLA.  Peter went onto to say that her role with Mike was "over" and he needed to tell her now, before she took FMLA leave, or she could "come after them" when she returned for not holding her job.  Plaintiff immediately realized she was being discouraged from taking FMLA and being retaliated against for requesting to take FMLA leave as Peter was already telling her that they were taking her job away from.  Peter also told Plaintiff at this time that the role she was being stripped of was being given to Jim Carini.  In sum, they were taking away Plaintiff's job at the time of her FMLA and giving it to a male similarly situated employee.

56.     Peter then told Plaintiff he thought she should go back to being an executive assistant. She was totally blindsided.  Plaintiff created and founded the Business Development Group and

it was now being stripped away, for no legitimate reason.  Peter Harding hired his friend, Mike

Stern to supervise the Business Development Group and Mike had now forced Plaintiff out and

demoted her because she was female. When Plaintiff objected, Peter insisted "you will be

happier being an assistant Katherine... I promise."

57.     During this conversation, Peter ordered Plaintiff to take vacation time instead of FMLA

leave.  Plaintiff was stunned about the denial of the FMLA leave and the demotion to executive

assistant. Peter informed Plaintiff she would be working for a new advisor Mark Ford.  Plaintiff

realized that she was being stripped of her job in retaliation for complaining to human resources

and requesting to take FMLA leave.  Peter had twisted her request for FMLA into her taking my

vacation time.  When Plaintiff stood up to leave, she looked at Peter and asked, "Are you tricking

me Pete?", to which he replied, "Now c'mon Katherine," acting offended.

58.     As a result of Defendant's interference with Plaintiff's FMLA leave, Plaintiff was forced

to use vacation time from August 7, 2018 through August 18, 2018 to care for her dying mother.

Peter denied Plaintiff FMLA leave, during which time Plaintiff's mother passed away.  Plaintiff

took three additional days after that of bereavement leave and she returned to work on August

24, 2018.

59.     On August 17, 2018, Peter announced Plaintiff's termination on a call with the entire

sales team.  This was prior to Plaintiff being notified.  He never referenced any new role on this

call, because there was no new role – it was merely a guise to try to trick Plaintiff from realizing

that her FMLA request was being interfered with, ignored and denied.

60.     On September 5, 2017, Peter Harding emailed Plaintiff to tell her that the workload was

insufficient with Mark Ford and so the executive assistant position was no longer an option for

her.  Peter said Mike Stern would meet with her in the morning to review other options.  The

following morning, Mike Stern called Plaintiff into the conference room.  Brian Kalamar from

HR was there.  Mike told Plaintiff that there were no other positions for her in the company and

that her role with the Business Development Group had been eliminated. Neither Peter Harding

nor anyone at CNG ever communicated with Plaintiff about her department being reduced or

future reductions in the department. In fact, there was not a workload insufficiency and

Plaintiff's job duties were given to a male employee.

61.     Plaintiff had been titled a Business Development Manager, Research Associate, Director

of Research and a Research Analyst, depending on who was in charge that day.  Suddenly after a

long history of discriminatory, offensive, hostile and abusive treatment, and immediately after

she attempted to go out on FMLA leave, Plaintiff was demoted, under false pretenses, to Mark

Fords assistant for a mere two weeks, and then she was terminated.

62.     Peter Harding and Defendant acted unlawfully and improperly regarding the status of

Plaintiff's position and her FMLA leave.  Peter Harding told Plaintiff that she would still have a

job with the company when she got back from caring for her dying mother, he interfered and

retaliated against her for attempting to take FMLA to care for her dying mother, and he treated

her unlawfully and disparately because she was female, and because was disabled and regarded

as disabled.   Peter Harding, Mike Stern and CNG intentionally interfered with Plaintiff's request

for FMLA.  Plaintiff's FMLA request was never followed up with an official meeting, nor was

she provided with any information about her rights or the leave process.

## VI.     COUNT ONE: FAMILY AND MEDICAL LEAVE ACT (FMLA) INTERFERENCE

63.     Paragraphs 1-62 are incorporated by reference herein.

64.     Plaintiff can successfully establish a prima facie case of interference in violation of the

FMLA against Defendant by showing that: (1) she was an "eligible employee" under the FMLA

as she was employed by CNG for over 11 years; (2) CNG is an employer as defined by the FMLA because the Defendant company employs more than 50 employees; (3) Plaintiff was entitled to leave under the FMLA as an employee who needed to be with and provide caretaking for her terminally ill mother as she neared her final days and Plaintiff needed time off due to her own medical condition; Plaintiff was diagnosed with Carpopedal Spasms, Severe Hyperventilation Syndrome and Grave's Disease; (4) Plaintiff provided CNG with clear notice of her intention to take leave on several occasions in July 2018; (5) CNG denied Plaintiff FMLA benefits to which she was entitled under the FMLA and CNG informed Plaintiff prior to her departure that she would be demoted after she returned from leave. Defendant yet further interfered with her reinstatement when CNG not only demoted her upon her return, but formally terminated her a mere two weeks upon her return from leave.

65.    CNG cannot and has not offered a legitimate non-discriminatory reason for denying FMLA leave, demoting Plaintiff and then terminating Plaintiff's employment. Based on Plaintiff's exemplary work and performance at CNG and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination. CNG's proffered explanation for the termination relating to insufficient work flow was false and disingenuous in that the workflow was plentiful and Plaintiff's job was replaced by a male employee.

66.    These actions constitute unlawful interference pursuant to the Family and Medical Leave Act.

## VII.    COUNT TWO: CONNECTICUT FAMILY AND MEDICAL LEAVE ACT (CTFMLA) INTERFERENCE

67.    Paragraphs 1-66 are incorporated by reference herein.

20

68.     Plaintiff can successfully establish a prima facie case of interference in violation of the CTFMLA against CNG by showing that (1) she was an "eligible employee" under the CTFMLA as she was employed by Defendant for over 11 years; (2) CNG  is an employer as defined by the FMLA because the Defendant company employ more than 75 employees; (3) Plaintiff was entitled to leave under the CTFMLA as an employee who needed to be with and provide caretaking for her terminally ill mother as she neared her final days and Plaintiff needed time off due to her own medical condition; Plaintiff was diagnosed with Carpopedal Spasms, Severe Hyperventilation Syndrome and Grave's Disease; (4) Plaintiff provided CNG with clear notice of her intention to take leave on several occasions in July 2018; (5) CNG denied Plaintiff benefits to which she was entitled under the CTFMLA and CNG informed Plaintiff prior to her departure that she would be demoted after she returned from leave.  Defendant further interfered with her reinstatement when CNG not only demoted her upon her return, but terminated her a mere two weeks after returning from CTFMLA leave.

69.     CNG cannot and has not offered a legitimate non-discriminatory reason for demoting Plaintiff and then terminating Plaintiff's employment. Based on Plaintiff's exemplary work and performance at CNG and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination. CNG's proffered explanation for the termination relating to insufficient work flow was false and disingenuous in that the workflow was plentiful and Plaintiff's job was replaced by a male employee.

70.     These actions constitute unlawful interference pursuant to the Connecticut Family and Medical Leave Act..

## VIII.   COUNT THREE: RETALIATION IN VIOLATION OF FAMILY AND MEDICAL LEAVE ACT (FMLA)

71.     Paragraphs 1-70 are incorporated by reference herein.

72.     Plaintiff can successfully establish a prima facie case of retaliation in violation of the FMLA against Defendant by showing that: (1) she exercised her rights protected under the FMLA when she requested leave; (2) she was qualified for her position as evidenced by her positive performance reviews, praiseworthy feedback, impressive results and 11 year tenure with the company; (3) she suffered adverse employment actions when she was instantly demoted upon her return to work and then terminated from her employment with CNG and (4) CNG's immediate demotion of Plaintiff once she asserted her FMLA rights and then abrupt termination of Plaintiff's employment, a mere two weeks after she returned from FMLA leave, gives rise to an inference of retaliatory intent.

73.     CNG cannot and has not offered a legitimate non-discriminatory reason for demoting Plaintiff and terminating Plaintiff's employment. Based on Plaintiff's exemplary work and performance at CNG and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination. CNG's proffered explanation for the termination relating to insufficient work flow was false and disingenuous in that the workflow was plentiful and Plaintiff's job was replaced by a male employee

74.     These actions constitute unlawful retaliation pursuant to the Family and Medical Leave Act.

## IX.     COUNT FOUR: RETALIATION IN VIOLATION OF CONNECTICUT FAMILY AND MEDICAL LEAVE ACT (CTFMLA)

75.     Paragraphs 1-74 are incorporated by reference herein.

76.     Plaintiff can successfully establish a prima facie case of retaliation in violation of the CTFMLA against Defendant by showing that: (1) she exercised her rights protected under the CTFMLA when she requested leave; (2) she was qualified for her position as evidenced by her positive performance reviews, praiseworthy feedback, impressive results and 11 year tenure with

the company the feedback; (3) she suffered adverse employment actions when she was demoted and then terminated from her employment with CNG and (4) CNG's immediate demotion of Plaintiff once she asserted her CTFMLA rights, and then abrupt termination of Plaintiff's employment, a mere two weeks after she returned from CTFMLA leave, gives rise to an inference of retaliatory intent.

77.    CNG cannot and has not offered legitimate non-discriminatory reason for demoting Plaintiff and terminating Plaintiff's employment. Based on Plaintiff's exemplary work and performance at CNG and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination. CNG's proffered explanation for the termination relating to insufficient work flow was false and disingenuous in that the workflow was plentiful and Plaintiff's job was replaced by a male employee.

78.    These actions constitute unlawful retaliation pursuant to the Connecticut Family and Medical Leave Act.

## X.    COUNT FIVE: DISABILITY DISCRIMINATION PURSUANT TO AMERICANS WITH DISABILITIES ACT (ADA)

79.    Paragraphs 1-78 are incorporated by reference herein.

80.    Plaintiff can successfully establish a prima facie case of disability discrimination against CNG by showing that: 1) her employer, CNG, is an employer subject to the ADA; 2) she was disabled within the meaning of the ADA when her employer was notified that she was taken to the hospital for Carpopedal Spasms, Severe Hyperventilation Syndrome and Grave's Disease; 3) she was otherwise qualified for her position and able to perform the essential functions of her job, with or without reasonable accommodations; 4) she suffered an adverse employment action, immediately thereafter when her employer was informed of this serious medical condition and she was instantly demoted and then abruptly terminated and 5) given the timing of these acts, a

causal connection exists between CNG's adverse actions and the protected activity which make it clear that Plaintiff suffered the adverse action substantially because of her disability.

81.     CNG has not and can offer a legitimate non-discriminatory reason for demoting and then terminating Plaintiff. Based on Plaintiff's exemplary work and performance at CNG and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination. CNG's proffered explanation for the termination relating to insufficient work flow was false and disingenuous in that the workflow was plentiful and Plaintiff's job was replaced by a nondisabled male employee.

82.     These actions constitute violations of the ADA.

## XI.     COUNT SIX: REGARDED AS DISABLITY DISCRIMINATION PURSUANT TO AMERICANS WITH DISABILITIES ACT (ADA)

83.     Paragraphs 1-82 are incorporated by reference herein.

84.     Plaintiff can successfully establish a prima facie case of regarded as disability discrimination against CNG by showing that: (1) her employer, CNG, is an employer subject to the ADA; 2) she was regarded as disabled within the meaning of the ADA when her employer was notified that she was taken to the hospital for Carpopedal Spasms, Severe Hyperventilation Syndrome and Grave's Disease; 3) she was otherwise qualified for her position and able to perform the essential functions of her job, with or without reasonable accommodations; 4) she suffered an adverse employment action immediately thereafter when her employer was informed of her serious medical condition and hospital stay and made a decision, based on this perceived disability to demote and then abruptly terminate her and (5) given the timing of these acts, a causal connection exists between CNG's adverse actions and the protected activity which make it clear that Plaintiff suffered the adverse action substantially because of her perceived disability.

85.     CNG has not and can offer a legitimate non-discriminatory reason for demoting and then terminating Plaintiff. Based on Plaintiff's exemplary work and performance at CNG and in the absence of a single negative review or issue, any reason proffered is not legitimate and a pretext for discrimination. CNG's proffered explanation for the termination relating to insufficient work flow was false and disingenuous in that the workflow was plentiful and Plaintiff's job was replaced by a nondisabled male employee.

86.     These actions constitute violations of the ADA.

## XII.   COUNT SEVEN: UNLAWFUL GENDER DISCRIMINATION PURSUANT TO TITLE VII

87.     Paragraphs 1-86 are incorporated by reference herein.

88.     Plaintiff can successfully establish a prima facie case of employment discrimination based on gender by showing that: (1) that she was a member of a class (female) protected by Title VII of the 1964 Civil Rights Act ("Title VII"); (2) that she was otherwise qualified for her position at CNG; (3) that she suffered an adverse employment action when she was treated disparately and differently from similarly situated male employees, demoted, terminated and replaced by a less experienced male employee and (4) that the adverse employment actions occurred under circumstances giving rise to an inference of gender discrimination.

89.     Plaintiff was blatantly isolated, excluded, targeted, mistreated and ultimately demoted and then terminated substantially because she is female. On information and belief, Defendant gave Plaintiff's job duties to another male employee and Plaintiff was replaced by a male employee which is sufficient evidence to raise an inference of discrimination.

90.     CNG cannot and has not offered a legitimate non-discriminatory reason for demoting and then terminating employment. Based on Plaintiff's exemplary work and performance at CNG and in the absence of a single negative review or issue, any reason proffered is not legitimate and

a pretext for discrimination. CNG's proffered explanation for the termination relating to insufficient work flow is a sham and disingenuous in that the workflow was plentiful and Plaintiff's job was replaced by a male.

91.     CNG favors and gives preferential treatment to similarly situated employees who are not female and has a workplace permeated with gender-based animus towards females.

92.     These actions constitute violations of Title VII.

## XIII.   COUNT EIGHT: HOSTILE WORK ENVIRONMENT BASED ON GENDER DISCRIMINATION

93.     Paragraphs 1-92 are incorporated by reference herein.

94.     Plaintiff can successfully establish that she suffered a hostile work environment in violation of 42 U.S.C.§ 2000e et.seq. and 29 U.S.C. § 621 et.seq. by showing that (1) her workplace was permeated with discriminatory intimidation that was sufficiently severe and pervasive to alter the conditions of her employment and that, (2) a specific basis exists for imputing the conduct that created the hostile environment to Defendants.

95.     Plaintiff's work environment was permeated by an atmosphere of discriminatory intimidation including daily hostile, insulting and aggressive language and treatment from her supervisor, Mike Stern and from CNG's President, Peter Harding.

96.     Plaintiff reported this behavior to Human Resources but CNG ignored her complaint and no action was taken. In fact, the only sham effort made to address the concerns was when Mike Stern demanded that Plaintiff come in after work hours to meet with him alone.

97.     The harassing and hostile behavior of Plaintiff's co-workers can be imputed to Defendant because after the numerous occasions when Plaintiff reported specific incidents of abusive and hostile behavior, CNG invariably failed to address her complaints.

## XIV.   COUNT NINE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

98.     Paragraphs 1- 97 are hereby incorporated by reference herein.

99.     Plaintiff can successfully establish a prima facie case of intentional infliction of emotional distress against Defendant by showing that: (1) Defendant knew or should have known that emotional distress was a likely result of its discriminatory and retaliatory conduct towards Plaintiff; (2) Defendant's intentional discriminatory and retaliatory conduct resulted in Plaintiff's wrongful and unlawful termination; (3) Defendant's conduct caused Plaintiff extreme emotional distress.

100.    Defendant's persistent and pervasive conduct, in particular the conduct of Mike Stern and Peter Harding, to which Plaintiff was subjected every day for many years, was intentional and so severe that Defendant should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

101.    CNG should be held liable on this count.

## XVI.  PRAYER FOR RELIEF

**WHEREFORE**, Katherine Kline hereby requests the following relief:

A.      Award compensatory damages;

B.      Award punitive damages;

C.      Award attorneys' fees and costs;

D.      Award pre-judgement interest;

E.      Award post-judgement interest;

F.      Award such other relief in law or equity as this Court deems appropriate.

### JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by her Complaint.

Respectfully Submitted,
PLAINTIFF
KATHERINE KLINE

By:/s/ Mark P. Carey
Mark P. Carey (ct17828)
Elizabeth W. Swedock
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
mcarey@capclaw.com
eswedock@capclaw.com

# EXHIBIT A

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Katherine Kline**
**41 Henderson Road**
**Fairfield, CT 06824**

From:  **Boston Area Office**
**John F. Kennedy Fed Bldg**
**Government Ctr, Room 475**
**Boston, MA 02203**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 523-2018-00093 | **Adriana Gomez,** **Investigator** | **(617) 565-3203** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)

**Feng K. An,**
**Area Office Director**

OCT 0 5 2018

(Date Mailed)

cc:  **CENTRAL NATIONAL GOTTESMAN, INC.**
**c/o Jody Cappello, Esq.**
**Winget, Spadafora, Schwartzberg**
**177 Broad Street, 10th Floor**
**Stamford, CT 06901**

**Elizabeth Swedock**
**MARK CAREY P.C.**
**71 Old Post Road**
**Southport, CT 06890**